IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ESTHER A. LUCERO,

        Plaintiff,

v.                                        No. CIV 12-1033 LFG

CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** is before the Court on Plaintiff Esther A. Lucero's ("Lucero") Motion to Reverse or Remand for Rehearing, filed February 15, 2013. [Doc. 20.] The Commissioner of Social Security issued a final decision denying benefits, finding that Lucero was not entitled to disability insurance benefits ("DIB") or supplemental security income ("SSI"). The Commissioner filed a response to Lucero's motion [Doc. 21], and Lucero filed a reply [Doc. 22]. Having considered the pleadings and exhibits submitted by the parties, the administrative record and the applicable law, the Court denies the motion to reverse or remand for the reasons described below.

I.    **GENERAL BACKGROUND**

This case involves two administrative law hearings before different ALJs, after the Appeals Council remanded the first ALJ's decision that was partially favorable for Lucero. The second ALJ's decision was adverse for Lucero, thereby erasing the earlier, partially favorable result.

The case has been proceeding for a number of years.  For example, Lucero was 43 years old on her alleged disability date of December 31, 2000. [AR 32, 109, 835.][1]  She was 51 years old at the first ALJ hearing in 2008, and 53 years old at the most recent ALJ's decision in 2010. [AR 856.]

Over the years, Lucero complained of ovarian cysts, hypothyroidism, bilateral knee pain, bilateral osteoarthritis after bilateral knee replacements in 2007, gastrointestinal reflux disease ("GERD"), urinary incontinence, diabetes mellitus, obesity and right subcalcaneal heel pain. [AR 24.] She initially asserted that arthritis and hyperthyroidism prevented her from working, as of December 2000. [AR 109.]  Later, during the first ALJ hearing in 2008, she claimed that her worst medical problem related to her legs or knees.

Lucero has a high school education.  She took some business school courses in 1997, and lacked about a month in obtaining her associate's degree in business. [AR 114, 869.] She has been married twice and divorced.  Her second marriage lasted 30 years. [AR 829.] Lucero testified at the beginning of the 2010 ALJ hearing that she was divorced and no longer went by the name of Muniz. She has four grown children. [AR 814, 817.] Lucero had past relevant work as a cashier supervisor and cashier checker. [AR 31.]

Her earnings were variable.  From 1974-1977, she earned from $46.21 one year to over $4000 in some years.  From 1978 through 1987, she had no earnings.  From 1988 to 2000, Lucero earned from $143.87 a year to over $9000.  Most annual earnings were less than $4000. [AR 85.]

---

[1]References to AR are to the Administrative Record.

## II.    **PROCEDURAL BACKGROUND**

On about November 7, 2005, Lucero filed applications for DIB and SSI. [AR 72-74, 78-80.]
She alleged she was disabled as of December 31, 2000, due to arthritis and hyperthyroidism.  [AR
64.] The original date Lucero was last insured was December 31, 2001. [AR 64.] After the last-
insured date, she alleged severe impairments of "bilateral osteoarthritis of the knees, status post right
total knee replacement on January 9, 2007; status post left total knee replacement on August 21,
2007, [GERD], urinary incontinence, diabetes mellitus, obesity, and right subcalcaneal heal pain."
[AR 24.]

The agency denied Lucero's benefit applications at the initial and reconsideration levels.
[AR 54, 64, 68, 292.] On May 8, 2008, ALJ George Reyes conducted an administrative hearing, at
which Lucero was present with her attorney, Ruth Cohen. [AR 824.] Lucero testified that her worst
medical problem then related to her legs or knees. [AR 829-30.] During the hearing, the ALJ stated
that he did not have much problem in finding Lucero was disabled from 2000 to the 2007, after her
knee replacement operations were completed. [AR 839.] However, after the second knee
replacement surgery in 2007, Judge Reyes concluded that Lucero's surgeries had helped her a lot
and that she was capable of other work.  The ALJ asked counsel if she wished to speak to Lucero
about considering a possible closed period, or if Lucero wanted to "go for the whole thing." [Id.]
After conferring with Lucero off the record, counsel reported that Lucero felt she was still disabled
and would not accept the suggestion of a closed period in terms of 8-years of benefits. [AR 840.]
Thus, the hearing proceeded.

On June 24, 2008, ALJ Reyes issued a partially favorable opinion, concluding that Lucero
was disabled within the meaning of the Social Security Act ("SSA") from December 31, 2000

through March 7, 2008.[2]  As of May 30, 2008, however, the ALJ found that medical improvement occurred that was related to Lucero's ability to work and that she could perform substantial gainful activity from that date through June 24, 2008.  Thus, Lucero's disability ended on May 30, 2008. [AR 292, 303.]

On July 17, 2008, Lucero, while represented by counsel, requested review by the Appeals Council. [AR 337.]  A letter from counsel to the Office of Disability Adjudication and Review, dated August 5, 2008, states that the ALJ's decision to end Lucero's benefits on June 1, 2008, was not supported by substantial evidence and was contrary to law.  Lucero's attorney argued that Judge Reyes's decision with respect to the denial of benefits after May 2008 should be reversed and that this part of the decision should be remanded. [AR 335.] Stated differently, Lucero intended to request review of only the unfavorable portion of the ALJ's decision.

On September 25, 2009, the Appeals Council vacated the ALJ's decision in its entirety and remanded the case for further administrative proceedings. [AR 284-87.] The Appeals Council issued a written decision, finding that Judge Reyes's decision contained inconsistent findings about Lucero's disability and medical improvement, including the problem with the ALJ's failure to address the period from March 8, 2008 through May 29, 2008. [AR 284.] The Appeals Council recognized, however, that this might have been a drafting error.  The Council remanded for clarification on this point.

In addition, the Appeals Council concluded that further consideration of Lucero's disability onset date was warranted on remand, and that treatment notes did not reflect complaints of knee

---

[2]It is unclear, as noted later by the Appeals Council, why the ALJ determined the impairment lasted through March 7, 2008, but that, medical improvement did not occur until about two months later at the end of May.  There may have been a typographical error since the ALJ found that Lucero's disability ended on May 30, 2008.

impairments during a portion of the favorable period of December 31, 2000 through March 7, 2008.
[AR 285.] The Appeals Council also found that the ALJ's decision mischaracterized some of the
vocational expert's testimony and that there was no evidence to support the ALJ's conclusion that
Lucero was disabled.  The Appeals Council identified other problems with the ALJ's opinion and
provided specific instructions for remand.  The Appeals Council further noted that on August 12,
2008, Lucero filed subsequent claims for a period of disability in relation to DIB and SSI.  [AR
286.] The Appeals Council stated its action regarding the current claims rendered Lucero's
subsequent claims "duplicate."  Thus, the ALJ was to associate the claims files and issue a new
decision on the associated claims. [AR 286.]

Consistent with the Appeals Council's remand, on June 22, 2010, ALJ Ann Farris held a
hearing by video conference.  Lucero, with her same attorney, appeared in El Paso.  The ALJ and
the VE were present in Albuquerque. [AR 858.] Judge Farris noted that the case was before her on
remand from a "previous grant of a closed period of disability."  Judge Farris clearly stated that she
was going to "re-adjudicate the entire claim based on the appeals council order." [AR 85.]  Lucero
stated "Okay."  No objections were raised with respect to the ALJ's statement that she was
reviewing the entire case, rather than only the unfavorable portion of the earlier ALJ's decision from
which Lucero sought review.

On September 3, 2010, Judge Farris issued an unfavorable decision. [AR 22-33.] The ALJ
concluded that after considering all of the evidence, Lucero was not under a disability from the onset
date of December 31,2000 through the date of this ALJ's decision, September 3, 2010.  [AR 23, 33.]

By December 6, 2010, Lucero had new counsel, and attorney Gary Martone filed a request
for review on her behalf. [AR 16.] Attorney Martone first asked to extend the time to appeal because
her previous attorney did not advise her of the denial of her claim in a timely manner and also

because of Lucero's anxiety, depression, and pain. [AR 14.] The Appeals Council informed attorney Martone several times that Lucero's case was still pending and unassigned. [AR 11, 12, 13.]

In a letter to the Appeals Council, dated July 9, 2012, Attorney Martone argued that Lucero's prior counsel should have accepted Judge Reyes's partially favorable decision of June 24, 2008, and then have filed new concurrent applications with an onset date of June 25, 2008 or some other date on or before December 31, 2009. [AR 747.] Attorney Martone stated that the "disability freeze" moved the date Lucero was last insured from December 31, 2000 to December 31, 2009. [Doc. 20, at 10 (*citing* AR 350; 20 C.F.R. § 404.120(b)).  Attorney Martone acknowledged that prior counsel's request for review clearly permitted the Appeals Council to review the whole case, but he contended that by requesting review, prior counsel for Lucero placed the favorable portion of Judge Reyes's decision at risk. [AR 748.]

On August 15, 2012, the Appeals Council denied the request for review.  It noted that Lucero did not file her request on time but found good reason for the delay.  The Appeals Council considered Lucero's attorney's letter of July 2012, medical records from 2009-2011, and an x-ray report of November 21, 2011. [AR 3.] The Appeals Council further noted that it considered Lucero's attorney's request to withdraw the prior request for review and reinstate Judge Reyes's June 24, 2008 partially favorable decision.  However, the Council explained that it already acted on that prior request, and further concluded that no basis existed to grant the request to withdraw the previous request for review.  In addition, the Appeals Council found no reason to review ALJ Farris's unfavorable decision.  [AR 4-8.] On October 4, 2012, Lucero filed the present complaint. [Doc. 1.]

## III.   LUCERO'S REQUEST TO REINSTATE ALJ REYES'S PARTIALLY FAVORABLE DECISION

Before addressing Lucero's argument that Judge Farris erred at steps two through five of the sequential analysis in relation to Lucero's obesity and urinary incontinence [Doc. 20], the Court analyzes Lucero's first argument that Judge Reyes's prior decision should be reinstated.  That argument is legal in nature and does not require an analysis of the medical record.

In Lucero's opening brief, she notes the procedural history leading up to Judge Reyes's June 24, 2008 decision.  Judge Reyes concluded, at step five, that Lucero could perform other work beginning on May 30, 2008.  However, as stated above, Judge Reyes found Lucero to be disabled from the onset date through March 7, 2008 or May 30, 2008. [AR 292.] Lucero's attorney submits the following argument:

> Inexplicably[3] and to Ms. Lucero's detriment, her prior attorney appealed the partially favorable decision to the Appeals council (AC) and attempted to limit the issues to just the unfavorable portion of ALJ Reyes's decision.  AR 333-339.  However, a limited request for review arguably exposes the entire case to review.  <u>Gronda v. Sec'y of Health & Human Servs.</u>, 856 F.2d 36 (6th Cir. 1988); *contra*, <u>Bivines v. Bowen</u>, 833 F.2d 293 (11th Cir. 1987).

[Doc. 20, at 3.] Lucero discussed ALJ's decision on remand and the fact that as a result of ALJ Farris's unfavorable decision, Lucero "lost all benefits of the prior partially favorable decision by

---

[3]Based on the ALJ's clearly expressed proposal at the hearing to grant a closed period of disability from late 2000 to mid-2008, it is not necessarily "inexplicable" that Lucero's prior attorney appealed the ALJ's later decision to this effect.  After all, Lucero was allowed to consider that proposal with counsel off the record, and counsel then explained at the hearing that it was Lucero's decision to reject the proposal because she believed that she continued to be disabled after the closed period.  The record does not indicate if prior counsel agreed or disagreed with Lucero's decision.

ALJ Reyes.  It appears that following ALJ Farris's decision, Ms. Lucero's prior counsel failed to advise her adequately about her right to appeal.[4]  AR 14-15, 18." [Doc. 20, at 5.]

Current counsel for Lucero further argues that "[i]f Ms. Lucero believed that she was still disabled, she should have been advised to accept the closed period of disability granted by ALJ Reyes and to file a new disability insurance application alleging an onset date of June 25, 2008, the day after ALJ Reyes's decision and she would have been within her date last insured.  She would have to show a disability on or before December 31, 2009." [Doc. 20, at 10-11.]

Lucero contends that her prior counsel did not safeguard her interests consistent with an attorney's obligation and that prior counsel's ineffective assistance of counsel is ground for remand. "But for the mistake made by Ms. Lucero's prior attorney in appealing from ALJ Reyes's decision, Ms. Lucero would have received benefits for a closed period of disability, her date last insured would have been December 31, 2009, and she could have filed new applications with her date last insured being in the future." [Id., at 11.] According to current counsel, Lucero had no legal or financial interest in appealing the first ALJ's decision.

Lucero further argues that when the Appeals Council accepted the request to review ALJ Reyes's decision and issued its decision to remand, it should have notified Lucero of the possibility of losing the closed period of disability. [Id., at 11-12.] "The Appeals Counsel should have explained to Ms. Lucero what it meant to have ALJ Reyes's decision vacated and should have explained to Ms. Lucero the effect of *de novo* review.  20 C.F.R. 404.977."[5] [Id., at 12.] Counsel

---

[4]It is unclear how prior counsel advised Lucero about her right to appeal ALJ Farris's unfavorable decision, but the facts demonstrate that the Appeals Council accepted her late request for review.

[5]After reviewing § 404.977 ("Case remanded by Appeals Council") it is unclear how this section furthers Lucero's argument concerning her right to an explanation about *de novo* review.  This section discusses when the Appeals Council may remand a case, requires the ALJ to take any action that the

specifically asserts that ALJ Farris should have explained to Lucero the effect of a *de novo* review when she gave notice of the second hearing and should have given Lucero an opportunity to object. [Id.] (*citing* 20 C.F.R. §§ 404.938 and 404.939).

Lucero asks that this case be remanded with directions to reinstate Judge Reyes's June 24, 2008 decision.  Alternatively, she requests remand directing the ALJ to consider the equitable and legal arguments in favor of such reinstatement. [Id., at 12.]

Lucero's request to reinstate an earlier ALJ's decision after the applicant requested review of that decision and claim of ineffective assistance of counsel in support of remand present unusual circumstances.  Moreover, there are no cases by our Circuit Court and only a few cases from other circuits addressing such issues.

As candidly admitted by present counsel for Lucero [Doc. 20, at 3], a limited request for review exposes the entire case to review and possible reversal, even of the favorable portions of the challenged decision.  Indeed, 20 C.F.R. § 404.970(b) provides that "[t]he Appeals Council *shall* evaluate the entire record including the new and material evidence submitted . . . ."  (emphasis added).  The section also states that the Appeals Council reviews the case to determine if the ALJ's action, findings, or conclusion are contrary to the weight of the evidence currently of record.  Id.

Another section, 20 C.F.R. § 404.976(a) provides that the Appeals Council itself may limit the issues it considers if it notifies the parties of the issues it will review.  However, the parties do not identify any portion of the pertinent regulations that support the argument that the party, in contrast to the Council, may limit the issues.

---

Appeals Council orders, requires the ALJ to notify the parties that the case was sent to the Appeals Council, explains the rules for filing briefs, and contemplates that the Appeals Council may remand for a rehearing.  20 C.F.R. § 404.977.

One of the few circuit courts to review a similar issue determined that notwithstanding the claimant's request that the Appeals Council review only a narrow aspect of an ALJ's decision, the Appeals Council had jurisdiction to review the entire case. Gronda, 856 F.2d at 37, 38-39. The facts of Gronda, while not identical to those here, have some bearing on the question. The claimant received a partially favorable decision from the ALJ, who determined that Gronda was disabled as of April 1985. Gronda, however, requested that he be found disabled before that date. In his request for review, Gronda stated that he was not appealing the decision that he was disabled after April 1985. Id. at 37. The Appeals Council notified Gronda that it granted his request for review and concluded that the ALJ's finding of disability was not supported by substantial evidence. Id. at 37-38.

Gronda filed a civil action in federal district court, and the trial court ruled in favor of the Commissioner. Gronda appealed and argued that the Appeals Council was limited to reviewing the date of onset question unless it gave him notice within 60 days of the ALJ's decision. In so arguing, Gronda relied on 20 C.F.R. § 404.969.[6] The Sixth Circuit discussed several cases addressing whether notice was required under such circumstances.

In DeLong v. Heckler, 771 F.2d 266, 268 (7th Cir. 1985), Judge Posner stated that "it would be a quite pointless exercise in shuffling paper for the Council, having received the claimant's notice of appeal within 60 days, to then have to issue its own notice of intent to review the case." The Seventh Circuit noted that the Appeals Council's practice "did not operate unfairly, because partially successful claimants are unable to foreclose review of their cases simply by refusing to appeal."

---

[6]That revised regulation now states that if the Appeals Council decides to review a decision or dismissal on its own motion, it will mail a notice of review to all parties. 20 C.F.R. § 404.969(d).

Gronda, 856 F.2d at 38 (*citing* DeLong, 771 F.2d at 268).  Stated differently, under the regulations, the Appeals Council can always undertake review of an entire case on its own motion.

The Sixth Circuit agreed with Judge Posner.  While it noted that it would be desirable to include in the regulations a warning that an appeal would put the entire decision at issue, the court could not say that due process required such warning.  "The only 'unfairness' Gronda can complain of is that he asked the Appeals council to review only one part of the decision, and the Council reviewed the entire decision.  Because the Council unquestionably has the power to review a decision on its own initiative, there is no unfairness implicit in such an occurrence."  Id. at 39.

Based on the regulatory language and decisions by the few court decisions to address this issue, the Court concludes that the Appeals Council could and did properly analyze the entire ALJ decision rather than limiting its review to the portions of the decision that Lucero challenged.  In addition, the Court rejects Lucero's position that before reviewing the entire ALJ decision, the Council was obligated to provide her more notice that she received.  *See* discussion *infra*.

The Court observes that in Everhart v. Bowen, 694 F. Supp. 1518, 1521-23 (D. Colo. 1987), a federal district court within this Circuit found to the contrary.  In that case, the district court articulated the question as follows: "when a Social Security claimant makes a timely application for review of a limited issue, does the Appeals Council remain obligated to provide notice within 60 days of the ALJ decision of its intention to undertake broader or full review, or can the Appeals Council review, sua sponte, questions clearly beyond those framed by the claimant?"  Id. at 1521.  The Colorado District Court noted a split in authority and sided with the Third and Eleventh Circuit Courts.  The Everhart Court identified a number of concerns to support the conclusion that the Appeals Council was required to notify the claimant that it was reviewing the entire case and

decision.  Moreover, the district court did not find Judge Posner's ruling persuasive, and at that time, the Sixth Circuit had not yet issued its decision in Gronda.

In so finding, the Everhart Court relied on the following reasoning by the Third Circuit:

> There is nothing on the face of § 404.969 which absolves the Council of its self-imposed duty to provide timely notification of review simply because the claimant has previously filed for reconsideration . . . .  When the review anticipated by the Council is to be substantially greater than, or entirely different from, that requested, such notice albeit "counter-notice" of a sort, is neither redundant nor superfluous but rises to the level of necessity.

Id. at 1522-23 (citation omitted).  The Colorado District Court further reasoned that if a claimant received notice that the Appeals Council could, at any time, expand sua sponte the scope of review, the "claimant may have thought long and hard about the propriety of filing any appeal, and may have been more content to accept the 'half loaf' which the ALJ ruling represented."  Id. at 1523. Thus, the Everhart Court concluded that due process considerations required that the Social Security Administration fully apprise claimants in advance of the risks associated with filing an appeal.

Under the facts presented in this case, the Court does not find the reasoning and ruling in Everhart to be persuasive.  This case simply presents different circumstances.  Here, the agency informed Lucero and her earlier attorney of the risks *before* she sought review before the Appeals Council.  The "Notice of Decision-Partially Favorable," dated June 24, 2008, sent to Muniz/Lucero and her attorney, reviews the appeals process.  It states: "If you file an appeal, the Council will consider *all of my decision*, even the parts with which you agree.  The Council may review your case for any reason." [AR 289] (emphasis added).  The notice further states that by requesting review, the "entire record of your case" is placed before the Council. [AR 289.] Therefore, in this case, unlike the facts in Everhart apparently, Lucero and her prior attorney were informed that the Appeals Council would review the entire ALJ decision and the entire record if she requested review.  She

12

was duly warned of the risk before she ever undertook her request for review.  Lucero had the chance to think "long and hard" about the wisdom of filing an appeal that would subject her entire case to review.

There is another distinction.  Here, during the earlier ALJ hearing, Judge Reyes expressly explained that he was inclined to grant an 8-year closed period of disability to Lucero.  After allowing Lucero to discuss this option with her counsel, Lucero rejected the ALJ's proposal and decided she wanted more than 8-years of benefits.  Thus, she accepted the risk of losing a proposed 8-year period of disability benefits at that time as well.  This is not a case where Lucero had no knowledge of what she might be giving up or risking, either when she rejected the ALJ's proposal or when she sought review.

Lucero also argued that ALJ Farris should have provided more of an explanation to her concerning the effect of a de novo review.  But, that argument is similarly unpersuasive.  At the very beginning of the hearing, the ALJ explained that the case was before her on remand from a previous grant of a closed period of disability, and she was going to re-adjudicate "the entire claim" based on the Appeal Council's Order.  [AR 858.]  Lucero did not object or protest, but rather, stated "okay" in response to this statement.  So, too, her counsel could have, but did not, object.  For whatever reason, Lucero believed she could succeed in obtaining more than an 8-year closed period of disability.

Lucero also asserted that equitable and legal arguments supported reinstatement of the previous ALJ's decision.  She argued that her prior counsel was ineffective.  Generally speaking, however, ineffective assistance of counsel, even if proven, is not grounds for remand in a social security case, where the claimant has no Sixth Amendment right to the effective assistance of counsel.  Moreover, the case cited by Lucero, Baez v. Astrue, 550 F.Supp.2d 210, 217 (D. Mass.

13

2008) is distinguishable.  In <u>Baez,</u> the claimant was represented by a non-attorney representative who was not well-versed in the facts or history of that case.  In addition, the case as it applies to ineffective assistance of counsel in social security cases stands almost alone, with only a few other similar cases, most of which concern the claimant's failure to have had the full hearing to which he or she was entitled because of the representative's lack of preparation, assistance and representation. There is no argument here that Lucero did not have a full hearing before the ALJ.

Here, Lucero's representative was an attorney, and she was prepared for the hearing.  She knew the facts of the case and asked appropriate questions during the hearing.  Moreover, her advocacy was effective in that she secured a partial award of benefits.  In addition, the Court does not find the reasoning in <u>Baez</u> persuasive here where the ALJ expressly advised Lucero during the hearing of his intent to award a closed period of benefits and Lucero accepted the risks of losing that proposal by rejecting it.

The Court finds no grounds to reinstate Judge Reyes's partially favorable decision.  This is particularly true where the Appeals Council identified errors in the ALJ's decision, including inconsistent findings by the ALJ, mischaracterizations of the VE's testimony by the ALJ, and insufficient evidence to support some of the ALJ's conclusions as to disability.  Thus, the Court denies Lucero's request to reinstate Judge Reyes's June 24, 2008 decision.

The Court now turns to the medical record and Lucero's arguments concerning ALJ Farris's decision, along with the pertinent standards of review.

## IV.    STANDARDS FOR DETERMINING DISABILITY

In determining disability, the Commissioner applies a five-step sequential evaluation process.[7]  The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[8]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[9] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits her physical or mental ability to do basic work activities . . . .;"[10] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[11] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[12]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering

---

[7]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[8]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[9]20 C.F.R. § 404.1520(b) (1999).

[10]20 C.F.R. § 404.1520(c) (1999).

[11]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent [her] from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[12]20 C.F.R. § 404.1520(e) (1999).

claimant's RFC,[13] age, education and past work experience, she is capable of performing other work.[14]

## V.  STANDARD OF REVIEW

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004). A decision is not based on substantial evidence "if it is overwhelmed by other evidence in the record."  Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009) (internal quotation marks omitted).

The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards.  Hamlin, 365 F.3d at 1214.

It is of no import whether the Court believes that a claimant is disabled.  Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the

---

[13]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[14]20 C.F.R. § 404.1520(f) (1999).

Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

## VI.   ALJ FARRIS'S FINDINGS

Judge Farris found that Lucero met the insured status requirements of the SSA through December 31, 2001, and that she did not engage in substantial gainful activity since December 31, 2000, the alleged onset of disability. [AR 24.] The ALJ determined Lucero had severe impairments "prior to December 31, 2000[15] [sic], her date last insured," of "ovarian cysts, hypothyroidism, and bilateral knee pain." [AR 24.] "After her date last insured of December 31, 2000 [sic], she has severe impairments that included the following: bilateral osteoarthritis of the knees; status post right total knee replacement on January 9, 2007; status post [] left total knee replacement on August 21, 2007; [] GERD; urinary incontinence; diabetes mellitus; obesity; and right subcalcaneal heel pain." [AR 24.]

---

[15]Since Judge Farris noted in a previous paragraph a last insured date of December 31, *2001*, it is clear that the references to December 31, *2000* as the last insured dates are drafting errors. [AR 24, ¶ 1.]

Judge Farris provided a thorough analysis why she did not find Lucero's depression, anxiety, and right carpal tunnel to be severe impairments.  The analysis included discussion of Lucero's daily activities, medical records and procedures, treatment for depression and related limited restrictions in daily activities. [AR 25-26.] The ALJ determined that the alleged impairments caused no more than a minimal effect on Lucero's ability to work. [AR 26.]

The ALJ also found that Lucero's impairments or combination of impairments did not meet or medically equal a listed impairment, including Listing Nos. 1.02A, 9.08, 13.09, 13.16, and 13.23. [AR 26.] Judge Farris referred to SSR 02-1p, noting that she considered the effects of Lucero's obesity by itself and in combination with other impairments.  The judge found no evidence that Lucero's impairments alone rendered her unable to ambulate effectively, and no evidence that her obesity increased the severity of any co-existing impairments to the extent that the combination of impairments met or medically equaled the criteria of a Listing section. [AR 26.]

After careful consideration of the entire record, the ALJ concluded that Lucero had the RFC to perform less than a full range of light work that included the following: "must alternate between sitting and standing approximately every 30 minutes; [s]he cannot kneel, crouch or crawl; [s]he can occasionally climb stairs; and [s]he must never climb ladders, or scaffolds." [AR 26.] The ALJ proceeded to make credibility findings, after considering Lucero's testimony at the hearing and the evidence.  The ALJ determined that while her medically determinable impairments could reasonably be expected to cause the alleged symptoms, Lucero's statements about the intensity, persistence and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC. [AR 27.]    In so finding the ALJ extensively reviewed the medical records, as well as Lucero's described daily activities. [AR 28-30.]

18

The ALJ decided that for DIB purposes, Lucero was not disabled prior to her last insured date of December 31, 2001. [AR 30.] For SSI purposes, the ALJ considered Dr. Bryant's opinions and report, dated March 22, 2006, but noted they were before Lucero had total knee replacement surgeries in 2007.  Later medical reports indicated positive results.  Dr. Frank Bryant was with Southwest Spine in Alamogordo, New Mexico.

The ALJ listed some of Lucero's medications as well, observing she took medication for pain, for thyroid problems, for her overactive bladder, and for heartburn/GERD. [AR 31.]

Based on the VE's testimony, the ALJ decided Lucero was unable to perform any past relevant work as a cashier supervisor and cashier checker. [AR 31.] The ALJ noted that Lucero was 43 years old as of the onset date and was considered a younger individual.  She had at least a high school education and acquired work skills from past relevant work. [AR 32.]

Considering her age, education, work experience, and RFC in conjunction with the grids, the ALJ found that Lucero acquired work skills from past relevant work that were transferable to occupations with jobs that existed in significant numbers. [AR 32.] The ALJ noted that Lucero's additional limitations did not allow her to perform a full range of light work, but based on the VE testified that Lucero could perform the positions of booth/office cashier (light, unskilled), the ALJ concluded Lucero was not disabled relying on the grids as a framework. [AR 32-33.] Thus, Lucero was not disabled at any time from the date of onset through the (second) ALJ decision of September 3, 2010.

VII.   **MEDICAL HISTORY[16] AND BACKGROUND**

Lucero challenges ALJ Farris's step two findings regarding obesity and urinary incontinence, arguing, in part, that the findings were inconsistent.  Judge Farris did not find Lucero's obesity and urinary incontinence to be severe impairments before the last insured date of December 31, 2001, but did find them severe after the date of last insured. [AR 24.] Lucero argues that the ALJ should have explained "why the obesity was not a severe impairment prior to the date last insured when her condition was nearly identical to the time period after the date last insured when the ALJ deemed obesity was a severe impairment." [Doc. 20, at 13.] She makes a similar argument concerning urinary incontinence.  Lucero further asserts the ALJ did not indicate how these impairments affected the RFC finding. [Id., at 13-14.]

The Court reviewed every record in the administrative record, but focuses its summary of records on the limited challenges Lucero makes concerning obesity and urinary incontinence.

### *2000 Medical Records*

There are a few medical records from 2000.  Lucero had some blood work done and a CT of the head that was fine.  None of the records, to the extent the Court could read them, noted diagnoses of or treatment for obesity and urinary incontinence. [AR 256, 259, 262, 263, 267, 372.]

December 31, 2000 was the date of onset of disability.

---

[16]The Court realizes that this case was remanded and that two separate ALJs examined the record, but that does not explain the significant duplication of medical records.  In some cases, there are up to four or more copies of the same record.  *See, e.g.,* [AR 372, 407, 545, 653; AR 486, 488, 600, 603, 709, 711; AR 427, 542, 650; AR 485, 599, 600, 707, 708; AR 480, 595, 703; AR 160, 191, 197, 217; AR 417, 532, 640; AR 159, 478, 593, 701; AR 158, 477, 592, 700; AR 157, 476, 591, 699; AR 156, 475, 590, 698; AR 154, 185, 473, 588, 696; AR 467, 514, 582, 688, 723; AR 460, 575, 617, 683; AR 459, 573, 616, 622, 682; AR 368, 391, 394.] The Court suspects there may be at least 100 pages of duplicate records, if not more. Such duplication should be reduced or eliminated to the extent possible.  It unnecessarily increases the time required to review the record.

### *2001 Medical Records*

In 2001, Lucero complained of leg pain and of incontinence upon coughing or sneezing. [AR 224.] In April 2001, Lucero appeared to complain of pain. [AR 430.] In May 2001, she had a urinary tract infection ("UTI"), an ovarian cyst, and hematuria.[17] [AR 223, 372.] The IVP for hematuria in May 2001 was within normal ranges. [AR 487.] Lucero had a lot of lab work done in this year.  She complained of pelvic pain in relation to the UTI.  An ultrasound for right pelvic pain indicated "prominent ovarian cysts." [AR 486.] On August 30, 2001, a physician wrote that he evaluated Lucero's right lower quadrant pain.  The urologic review was unremarkable, as was the physical exam.  He noted that Lucero was "moderately obese."  She could not reproduce the pain on exam. [AR 240.] On September 25, 2001, Lucero had the cyst removed. [AR 228, 276, 428.] Dieting guidelines were provided in October 2001. [AR 229.]

December 31, 2001 is the date she was last insured.

### *2002 Medical Records*

There are few records from 2002.  Lucero was treated for a goiter. [AR 425, 483, 485.] In September, she complained of right knee pain that she had for six weeks.  It had worsened. [AR 424.] A September 5, 2002 test indicated not much abnormality in the knee although she had osteoarthritis. [AR 597.]

---

[17]"Hematuria is blood in the urine." "Intravenous pyelogram (IVP) is an x ray of the urinary tract."  http://kidney.niddk.nih.gov/kudiseases/pubs/hematuria/#what (7/1/2013).

### *2003 and 2004 Medical Records*

Again, there are few medical records.  Lucero complained of knee pain.  She underwent chondroplasty[18] by Dr. Bryant in August 2003.  She had a torn meniscus.  There were "positive findings" as to the left knee. [AR 162, 178, 180.]

In 2004, Lucero had an x-ray for bilateral knee problems.  Osteoarthritis was the impression. [AR 480.] In December 2004, she received an injection in the right knee. [AR 419.]

### *2005 Medical and Disability Records*

There are no records before October 2005.  On October 17, 2005, Dr. Bryant saw Lucero for severe bilateral knee pain and recommended knee replacements or some sort of weight loss program. He supported her application for some sort of disability benefit.  He believed that if Lucero had successful knee replacement surgeries, she likely could return to some type of work. [AR 161.]

On November 7, 2005, Lucero applied for benefits. [AR 72.] She was 5 feet 4 inches tall and weighed 198 pounds.  She claimed that arthritis and hyperthyroidism prevented her from working. [AR 109.] Her legs always hurt and were swollen.  She could only be on her feet for an hour.  She stated that they first bothered her on June 18, 2003, but that she was unable to work as of December 31, 2000.[19]  Lucero stated she was working at the time and was babysitting from 1998 through the present.  She was a cashier from 1989 to 1998.  She had laser surgery in 2003 to "clean up" her knee. [AR 112.] She took Hydrocodone for pain and medication for her thyroid condition. [AR 109-

---

[18]"Chondroplasty refers to surgery of the cartilage, the most common being corrective surgery of the cartilage of the knee."  http://en.wikipedia.org/wiki/Chondroplasty (7/1/2013).

[19]The Court does not know if Lucero provided correct dates as it does not make sense that she was first bothered by her legs in 2003, but unable to work 2-3 years earlier.

114.] A disability interviewer noted Lucero had trouble standing and walking. She walked slowly with a cane and was slow to get in and out of a chair. [AR 116-117.]

Lucero's niece, Irma Draven, filled out a third-party report in late November 2005. [AR 119.] Draven saw Lucero weekly, who she stated lived alone then. Draven did not know Lucero's daily activities, but said she could not work due to severe pain that awakened her at night. She had no trouble with her personal care most of the time, but had problems walking or standing. Lucero could make quick meals. She did the dishes, laundry and light dusting. She needed help with heavier lifting. She could not work in the yard for long due to her legs. She could drive and went grocery shopping. Lucero liked to read and watch television daily. She sat and visited with others on a daily basis, but had problems lifting, squatting, bending, standing, walking, kneeling, climbing stairs, and completing tasks. She could lift about 10 pounds and stand for about 10 minutes. She was unable to complete most tasks, but had no problem paying attention or with directions. She used crutches, a walker, wheelchair, and a cane, but Draven did not know if they were prescribed. [AR 119-125.]

On November 26, 2005, Lucero filled out a function report. She described getting up at 6:30 a.m., showering, and making the bed. She then sat in the den unless she needed to do errands. She fixed breakfast, took out the trash, did dishes and laundry, and then prepared lunch. She read a book and went to pick up her granddaughter from school. She returned home, watched TV, ate supper, washed dishes, watched TV again, took a shower, went to bed and read. [AR 127.] Lucero took care of a small dog. She struggled to put on her pants, underwear, socks and shoes. It was hard to shave her legs and it hurt her knees to sit and stand. The remainder of the report reads much the same as the report filled out by her niece. [AR 127-133.] Lucero claimed the crutches and wheelchair were

23

prescribed after a surgery.   There is no confirmation in the medical record, nor is there any indication how long Lucero might have been directed to use assistive devices.

### *2006 Medical and Disability Records*

On January 20, 2006, Dr. Bryant filled out a medical opinion form regarding Lucero's ability to do work-related activities. He opined she could lift 20 pounds occasionally and 10 pounds frequently.   She could stand and walk less than two hours and sit unimpaired from 4-6 hours.   She had to do some alternating of position every hour.   Lucero could stand 15 minutes before needing to make changes and must walk around for 10 minutes at a time every hour.   She did not need to lie down.   Dr. Bryant found occasional limitations in all postural areas. [AR 204-05.] She was limited in her abilities to reach, handle, finger, and feel.   She had severe osteoarthritis in both knees, and Dr. Bryant predicted she would be absent twice a week from work.   She could not work full-time. However, Dr. Bryant filled out this form before Lucero had knee replacement surgeries in 2007.

On February 8, 2006, Dr. Bryant saw Lucero for knee problems, noting she had a significant disability in both knees then.   There was a remote possibility she could work at a sedentary job that involved sitting and frequent position changes for 3-4 hours at best.   She had no training or experience for this type of work.   Lucero's prognosis was poor.   Dr. Bryant believed that knee replacements would give her enough mobility to make gainful employment a realistic goal. [AR 161.]

In March 2006, Lucero's benefit applications were denied.   The agency found she was not disabled on any date through December 31, 2001, the last date of insurance. [AR 64.]

On March 22, 2006, Dr. Bryant wrote a letter on behalf of Lucero stating she had significant disability related to osteoarthritis of both knees.   She was unable to work 8 hours a day, 5 days a

week if standing.  The prognosis for a spontaneous recovery was poor.  She would, however, benefit from bilateral knee replacements. [AR 160.]

On March 29, 2006, Lucero was seen for knee pain, insomnia, and depression for the last month.  She had family difficulties at this time and was depressed.

On July 26, 2006, Lucero's earlier attorney requested an "on-the-record" disposition of the case. [AR 187, 193, 194.]

On September 20, 2006, Dr. Bryant again wrote a letter stating he had seen Lucero for a number of years for severe bilateral osteoarthritis of the knees.  Her symptoms of pain were ongoing.  He recommended and still proposed total knee replacements. [AR 159.] On November 14, 2006, the medical note indicates Lucero needed a referral for surgery on the right knee.  She felt unmotivated in life, but denied a plan to harm herself.  She was depressed and crying.  She was prescribed an anti-depressant and was to reschedule with a counseling center. [AR 416.] On November 22, 2006, Dr. Bryant wrote a letter stating Lucero had to have a right total knee replacement as she had reached the point of not being able to tolerate the knee pain. [AR 158.]

### *2007 Medical and Disability Records*

In early January 2007, Lucero had a total right knee replacement.  She felt very well a day after the procedure. [AR 172, 174, 175.] On January 31, 2007, Dr. Bryant noted Lucero had some edema but was using a walker. [AR 157.] In late February 2007, Dr. Bryant noted Lucero had minimal complaints, was walking well with a walker and was off all medications.  She asked about having the other knee replaced. [AR 156.]

In March 2007, Lucero complained of severe pain in the left knee.  She was to continue an exercise and diet program. [AR 415.]

In late May 2007, Dr. Bryant wrote a letter stating Lucero had no complaints after her right total knee replacement, and the exam showed a stable joint with excellent range of motion. There were no abnormalities. Lucero was considering left knee replacement surgery. [AR 155.

On June 9, 2007, Lucero filed a Disability Report-Appeal. She noted she received a cortisone shots in the knees on occasion. It is unclear why this appeal does not indicate knee replacement surgery. [AR 91.]

On August 1, 2007, Dr. Bryant wrote a letter stating Lucero wanted left knee replacement surgery due to "intractable" left knee pain. Medications did not help. She had severe erosive bone-on-bone osteoarthritis of the medial compartment. She needed a left knee replacement. [AR 154.] In mid-August 2007, Lucero had total left knee replacement surgery. The x-ray showed her knee was well seated and aligned after surgery. [AR 163, 168.] Upon discharge, she was ambulatory with a walker. [AR 164.] In September 2007, Lucero had some ache in the left knee but the results of the surgery looked good. She lacked 5 degrees to full extension as expected. The x-ray was good and she was to begin outpatient rehabilitation therapy. [AR 153.]

### *2008 Medical and Disability Records*

In March 2008, Lucero was seen with problems related to atypical squamous cells and was positive for high risk HPV.[20] She also complained of urine leakage if she coughed or sneezed. She awoke at night 3-4 times to urinate. She had to go to the bathroom every 2 hours during the day. She weighed 217 pounds at this time, and her GERD was untreated. She was diagnosed with severe

---

[20]"Human papillomavirus (HPV) is a virus from the papillomavirus family that is capable of infecting humans. Like all papillomaviruses, HPVs establish productive infections only in keratinocytes of the skin or mucous membranes. While the majority of the known types of HPV cause no symptoms in most people, some types can cause warts (verrucae), while others can—in a minority of cases—lead to cancers of the cervix, vulva, vagina, penis, oropharynx and anus."
http://en.wikipedia.org/wiki/Human_papillomavirus (7/1/2013).

vaginal atrophy, urinary urge and stress incontinence.  She was prescribed Detrol for the urinary urge incontinence. [AR 495.]

On May 7, 2008, Dr. Bryant noted she had minimal complaints after the left knee replacement.  Her range of motion was excellent and the knee was stable.  She could continue activities as tolerated and was to follow up in 2 years. [AR 147, 152.]

On April 1, 2008, Dr. Sampath noted Lucero had multiple problems and prescribed Prilosec for GERD.  She was doing quite well with that medication.  She had a history of urinary urge incontinence, and he placed her on Detrol.  She was "doing fine."  She had some severe urinary incontinence when she coughed or sneezed and wanted some repair.  Dr. Sampath's plan was to advise her to have a Monarc sling (procedure utilized to help resolve urinary incontinence) plus anterior colporrhaphy[21] at the end of April. [AR 186.]

On May 2, 2008, Dr. Sampath performed a procedure to resolve Lucero's urinary stress incontinence. [AR 467, 493.] Upon discharge, Lucero's chief complaint was noted as leakage or urine when she coughed and sneezed.  She also had urinary frequence and urgency. [AR 463.] Dr. Sampath noted she was healing well on May 5 and removed the catheter. [AR 461.]

On May 8, 2008, Lucero attended the first ALJ hearing before Judge Reyes.  Her surgery on May 2nd had gone well.  With respect to her 2007 knee replacement surgeries, Lucero testified that those surgeries helped her pain a "little bit," but that she still was recuperating.  Her left knee was still numb and hurt.  If she walked or stood a lot, she had pain. [AR 829.] She did not return to work,

---

[21]"Colporrhaphy (also vaginal wall repair, anterior and/or posterior colporrhaphy, anterior and/or posterior vaginal wall repair, or simply A/P repair or A&P repair) is a surgical procedure in humans that repairs a defect in the wall of the vagina. It is the surgical intervention for both cystocele (protrusion of the urinary bladder into the vagina) and rectocele (protrusion of the rectum into the vagina)." http://en.wikipedia.org/wiki/Colporrhaphy (7/1/2013).

as it was difficult to get a job without being able to stand.  Lucero never had a "sit down job."  Most of her jobs involved standing. [AR 829.] She complained that her worst problem was her legs.  After surgery, she rated knee pain as a 5 of 10, and she took Ibuprofen for pain. [AR 830.] If she was standing a lot, her pain was perhaps an 8.  While relaxing, the pain was not bad.  After surgery, her other leg pain was about a 3-5. [AR 832.] Judge Reyes noted that he was "fairly convinced" Lucero was under a lot of pain before surgery, but that afterwards, she was much improved.

On June 2, 2008, Dr. Sampath noted Lucero underwent an anterior colporrhaphy and Monarc sling and had no complaints.  The pelvic exam was good, and she was healing well.  She weighed 216 pounds. [AR 460.]

On June 24, 2008, ALJ Reyes issued the partially favorable decision that was discussed above. [AR 292-304.] He found Lucero's depression to be non-severe, but found severe bilateral osteoarthritis of the knees, status post knee replacements.  Judge Reyes discussed Lucero's obesity as exacerbating osteoarthritis of the knees.  The ALJ stated he replaced great weight on Dr. Bryant's medical opinion.  Judge Reyes determined Lucero could perform light work as of May 30, 2008, that which could be performed with the use of a cane and a sit/stand option. [AR 300.] Judge Reyes concluded Lucero could perform a significant number of jobs that existed as of May 30, 2008, although she could not perform all or substantially all of the requirements of light level work due to additional limitations. [AR 302.]

On July 17, 2008, counsel for Lucero filed a request for review, arguing that the ALJ's decision was not supported by substantial evidence and contained errors of law. [AR 337.]

On July 24, 2008, Lucero had run out of her medications for depression and felt depressed and overwhelmed.  She requested counseling.  The record indicates she had well-healed bilateral

knee replacements.  The assessments were depression, obesity, and knee pain.  The doctor discussed

diet and exercise with Lucero and referred her to counseling. [AR 413.]

On August 5, 2008, previous counsel for Lucero wrote to the Appeals Counsel, stating they

sought review of the ALJ's recent partially favorable decision.  Lucero's attorney stated the ALJ's

decision to end her benefits, as of June 1, 2008, was not supported by substantial evidence and was

contrary to law.  Lucero would testify she continued to have pain and to take pain medication.  She

suffered from severe urinary incontinence even with medication. [AR 334.] She had to use a cane.

Counsel argued that the ALJ's decision regarding a denial of benefits after May 31, 2008 should be

reversed or remanded. [AR 335.] Thus, Lucero's request for review was limited in scope.

### *2009 Medical, Therapy and Disability Records*

A significant number of the records in 2009 are counseling records,[22] many of which discuss

personal relationship problems.  Those are not repeated here.  However, therapy records that

mention Lucero's health, job history, and plans to work are summarized.

On February 10, 2009, Lucero had her first appointment with therapist Patty Hollister of

Mental Health Associates.  Lucero had multiple stressors, including financial and family troubles.

She was depressed but without any suicidal ideation.  She had a knee replacement; use of a cane is

noted. Lucero's legs hurt and complaints of pain were noted.  She reported having been a cashier

for 8 years and that she worked 4 years at Family Dollar. [AR 814-818.] The record, unlike medical

records, appears to indicate Lucero smoked.

---

[22]The 2009-2011 therapy records were not before either ALJ at the time they made their decisions
in 2008 and 2010, respectively.  However, Judge Farris's decision notes Lucero's testimony that she
attended counseling once a week. [AR 25.] The therapy records were provided to the Appeals Council;
thus, they became part of the record. *See* Krauser v. Astrue, 638 F.3d 1324, 1328 (10th Cir. 2011) (noting
it is well established that Appeals Council must consider additional evidence offered on administrative
review, after which that evidence "becomes a part of our record on judicial review").

On March 10, 2009, Lucero is noted to have applied for disability and that her attorney appealed. She had lost weight. She had a bladder procedure. Her plan was to volunteer at church or a hospital if she needed more people in her life. [AR 813.] A May 2009 therapy record indicated that Lucero walked a mile. [AR 808.] A May 12, 2009 record states that Lucero had no income. [AR 807.] She discussed a bilingual receptionist position, but did not want to jeopardize her disability application. The record notes she would keep applying for it. [AR 807.] A May 26, 2009 record indicates Lucero was disappointed due to someone else having being hired for the job. One of the issues addressed in therapy was that Lucero wanted to see about a job "right now." She did not like being dependent on her children. [AR 805.]

On June 2, 2009, Lucero reported she left an application for a receptionist position. [AR 804.] She would call in two weeks to check on it, and she felt good. The word "job" is listed as one of the things she was doing. [AR 804.] A June 16 therapy record shows that there was no reply from the job application. Her activities included walking and reading. [AR 803.]

On June 23, 2009, Lucero reviewed the classified job ads, noting a 4th grade "helping teacher" position. She decided she might make calls in reference to 3 ads. [AR 802.] On June 30, 2009, Lucero went to church. The therapy record indicates Lucero's attorney recommended she do nothing about a job until she received disability. She knew if she worked, the disability benefits would be taken away, as this happened to a friend. [AR 801.]

On July 8, 2009, Dr. Bryant saw Lucero for numbness, pain and tingling in her thumb, index and long fingers of the right hand. She dropped things and awoke at night with pain. Neither medications nor splinting helped. She had carpal tunnel syndrome. It was reasonable to offer surgery as an option. [AR 459.] On July 17, 2009, Dr. Bryant performed a carpal tunnel release procedure. [AR 623.]

30

On July 24, 2009, Lucero reported she was feeling depressed. She had financial and family stressors. There is a notation on the record that the therapist (Hollister) had seen Lucero 13 times at this point. The therapist stated Lucero's depressive symptoms were subsiding and that Lucero was committed to psychotherapy and felt it was making a positive difference. [AR 470.]

On August 3, 2009, Lucero showed the therapist scars from her carpal tunnel procedure. [AR 799.] On August 10, Lucero told her therapist she had seen her physician about a diabetes/blood sugar test. She was to consume a healthy diet and avoid smoking. She was to engage in moderate exercise. [AR 798.]

On August 13, 2009, Lucero started taking medication for diabetes. [AR 411.]

On August 24, 2009, Lucero reported to the therapist that she was happy. She had taken the "Alamo Hospice" information and would like to work part-time. She planned to walk and exercise more. [AR 797.] On August 31, 2009, she noted that she had osteoarthritis in the left and right knees. She could walk one mile a day. This record appears to state she was going to school about a receptionist position but it is not clear. She noted the School for the Blind needed a nurse from 3-11 p.m. She was checking with social security about her disability application. The therapist volunteered to fill out paperwork if it was needed. [AR 796.]

On September 14, 2009, the therapy record notes there was a job opening in the home health area. [AR 795.]

On September 25, 2009, the Appeals Council entered a Notice of Order remanding the case to an ALJ. [AR 283.] The Council entered a decision explaining the history of the case, including a description of Judge Reyes's partially favorable decision and Lucero's request for review. The Appeals Council vacated Judge Reyes's decision and remanded. It noted inconsistencies in Judge Reyes's decision and other problems with that ruling. [AR 284-88.]

31

A September 28, 2009 therapy record indicates something about a job fair occurring next week. [AR 794.] On October 12, 2009, the therapy record discusses that Lucero got drunk and passed out for the first time in her life.  It was noted as a one-time binge. [AR 793.]

On November 11, 2009, Lucero reported anxiety due to family problems.  Her son was convicted at a trial.  She was given a short prescription of Xanax. [AR 409.] On November 16, Lucero told the therapist that she might go to a singles group at her church although it was difficult. She was not trying not to take medications and was trying to stay busy. [AR 791.] On December 21, 2009, Lucero stated she was not ready to go to a singles group yet. [AR 789.] By December 28, she was considering going to the group with her daughter. [AR 788.]

### *2010 Medical, Therapy and Disability Records*

A January 4, 2010 therapy record indicates some thinking about Lucero "get[ting] out in community more." [AR 787.] On February 2, 2001, Lucero was not feeling well and did not care. She was depressed and stated she would drink a beer if she had it.  Her disability was "dragging on." [AR 786.] Four days later, she still was despondent.  She did not know what to do with her free time, but loved to come to therapy. [AR 785.] On February 22, 2010, Lucero's therapist asked what would give her a lift?  She listed music, thrift stores, reading, showers, salads.  There is a notation about orientation classes at a business college and a plan about computer classes. [AR 784.]

On March 1, 2010, Lucero's son was sentenced.  The focus of therapy was a discussion about Lucero's disability. [AR 783.] On March 7, 2010, Lucero had a follow-up appointment with the doctor about her diabetes.  She complained that her knee pain was worsening.  She was to continue taking Ibuprofen and was prescribed Lortab. [AR 375.]

On March 29, 2010, Lucero reported that her son was sentenced to an 8-year term of incarceration.  Lucero was despondent and crying.  She had not lost weight.  She was pro-active with

the disability delay.  It had been four years.  The therapy note lists thrift shops, reading and classes.

Lucero was drinking on the weekends although she knew it was against doctors' orders. [AR 782.]

There is a therapy note, dated April 5, 2010 that indicates Lucero was considering attending

singles groups. [AR 780.] Another therapy note on this date states that Lucero had an appointment

with vocational rehabilitation on April 8.  She had been thinking about classes.  She discussed

feelings about wanting to work.  Lucero got discouraged and had pain in her right foot from bone

spurs.  She feared another surgery but was not sure if she should stop walking.  She was thinking

about seeing Dr. Bryant and might ask the therapist for another letter to her disability attorney.  The

bottom of the notes lists plans to contact Dr. Bryant, go to vocational rehabilitation appointment,

and apply to Walmart or the Dollar Store.  Lucero's cashier experience is noted.  They discussed the

number of hours she could work, presumably in reference to her disability application. [AR 781.]

On April 14, 2010, Dr. Bryant indicated that Lucero came in for a follow-up appointment

in reference to two orthopedic issues.  She had total left knee replacement about a year ago.  It was

actually in 2007.  She reported occasional pain with extended walking.  Otherwise, she was satisfied

with the functional result.  A new problem was right subcalcaneal pain.  Lucero reported severe pain

in her heel in the morning.  She had a great deal of trouble getting out of bed, although the pain

lessened during the day.  On exam, Dr. Bryant noted that the left knee had 0-140 range of motion,

was stable, and without swelling.  As to the foot, the subtalar joint was normal.  She had severe pain

at the origin of the flexor digitorum brevis muscle.  An x-ray of the left knee showed the joint was

in good position.  There was no osteolysis.  Another x-ray indicated a large traction of bone spur in

the heel.  Otherwise, the x-ray of the foot/heel was normal.  Dr. Bryant gave Lucero steroid

injections.  She was to repeat injections and splinting at night if it was not better in a month. [AR

368.]

On April 19, 2010, Lucero had not been sleeping. She was walking 30 minutes a day. The therapy note indicates something about orientation and classes. Lucero was called after talking to Developmental Vocational rehab. The time of the orientation was confirmed. [AR 778.]

In June 2010, Lucero missed some therapy as her mother was very ill. Her therapist recommended that Lucero find time to walk every day. [AR 777.] In mid-June, Lucero's mother died.

On June 22, 2010, Lucero had the second ALJ hearing on remand. [AR 856.] Judge Farris explained that the case was before her upon remand from a previous grant of disability for a closed period and that she was going to re-adjudicate the entire claim based on the Appeals Council's Order. [AR 858.] Counsel was present and made no objection. During counsel's opening statement, she stated that Lucero had been disabled since 2000 and was not able to work since then. She had two knee replacements in 2007. There were ongoing problems that were not as severe. Lucero suffered from incontinence that resulted in surgery in May 2008 and continued with problems that also were not as bad as before surgery. [AR 861.] She had ongoing problems with anxiety and depression that were treated with medications. She had a heel spur. The combination of her physical and mental impairments prevented her from work. Lucero suffered from daily pain, depression, and fatigue. [AR 861.]

The ALJ reviewed her work experience and asked why Lucero could not work regularly in 2000. Lucero stated she was in a lot of pain from her knees and having to stand. [AR 863.] However, her treatment then consisted of over-the-counter Ibuprofen. She did not have insurance for other treatment. [AR 863.] She also stated she had steroid shots early on, although the Court did not find corresponding medical records. Lucero stated she still had pain. She was supposed to walk and diet but it was difficult. She was now taking prescription-strength Ibuprofen for pain. She also

34

took medications for her bladder, diabetes and heartburn.  She took Hydrocodone for severe pain, perhaps once a day. [AR 865.] Her knee surgeries made the pain "a little bit better." [AR 866.] She suffered from anxiety and depression and wanted to "give up on everything."  Lucero took Paxil for depression/anxiety, and it helped on some days. [AR 866.]  She also went to counseling once a week.

Lucero testified that she had some problems with her personal care.  She could drive.  She lived alone, and was able to cook and do the laundry.  Her children helped her clean.  She read and walked for short periods. [AR 868.] She took a shower daily, watched TV, did grocery shopping, came home and napped, and vacuumed a little.

When her attorney asked Lucero questions, she testified that in 2000-2001, she could only stand for a few hours and needed a break every 30 minutes. [AR 869-70.] She could sit 15 minutes at a time. [AR 871.] Lucero stated she had problems with incontinence when lifting. [AR 872.] Of the two knees, she had more pain with the left knee that she rated at an 8 or 9.  The pain in the right knee was 7 or 8.  She used a cane every day when she walked, and needed to alternate her position a lot. [AR 873.] She could not control her weight. [AR 873.] Lucero suffered from fatigue every hour and fell asleep when she sat down.  She blamed the fatigue on depression. [AR 874.]

A vocational expert testified that Lucero could perform sedentary work but could not do her past relevant work.  She would be able to work as a check cashier, food checker, and order clerk. [AR 877.]

On June 29, 2010, Lucero's therapist wrote to the attorney's office, summarizing the therapy records.  Hollister first met with Lucero in February 2009.  She had seen Lucero 33 times.  Lucero had symptoms of depression, but Hollister changed Lucero's diagnosis on May 12, 2009, as Lucero improved.  The therapist opined that if Lucero was working, her weak knee would require a leave

35

of absence.  The therapist indicated that if Lucero received disability support, she would get trained immediately.  Lucero was already going to the rehab office.  To date, Lucero had been waiting 4 years for disability, and the therapist hoped she would receive disability benefits. [AR 773-74.]

On July 6, 2010, Lucero reported to her therapist that she was depressed and not walking. She was hopeful about her disability application and expected to hear from disability services by the end of August.  She was looking for a place in town to rent. [Ara 772.]

On July 7, 2010, Hollister filled out a Mental Impairment Questionnaire.  Lucero's diagnosis was Adjustment Disorder with mixed emotional features, mostly depression.  She was currently grieving 3 family deaths over a 2-month period.  Hollister noted Lucero's decreased energy, but had not seen any mental impairment. [AR 767-68.] There were no side effects from medication and no mental limitations. [AR 768.] In fact, Hollister opined that mental impairments would never cause Lucero to be absent from work.  She was capable of a full-time job, 8 hours a day.  The therapist believed her only limitation would be if the job required standing and lifting.   The therapist recommended part-time work to start. [AR 767-69.]

On July 13, 2010, Lucero did not show up for her therapy appointment.  On July 20, she reported feeling depressed and alone.  The therapist suggested some sort of work with Hospice or some grief support.  She was to look for pleasurable activities. [AR 765.] On July 27, 2010, the therapist noted diet, exercise and walking, but it appears that Lucero did not show up for this appointment either and had not written down the date. [AR 764.] She complained to the therapist, on the telephone, that her knees hurt.

On August 3, 2010, she felt depressed.  The therapy notes indicate thrift store, a possible job, moving to a new house and walking 30 minutes a day. [AR 763.] On August 10, 2010, Lucero reported her legs hurt, but she did not bring a cane.  She was excited to move to "Alamo" over Labor

Day and had a lot of help from family and friends.  Every day, she waited to hear from disability services about the outcome of her application.  Lucero was starting to get more active.  She was to dedicate 30 minutes a day to walking.  The therapist provided two names of nurses who dealt with diet education. [AR 762.]

On August 17, 2010, the therapy note indicates Lucero was packing and that the trailer sold. She still was not walking but the move was progressing. [AR 761.] On August 31, 2010, the therapist suggested Lucero contact the attorney about the results of the disability application.  The note lists where Lucero would like to work, e.g., as a receptionist at some business, in a medical environment with limited lifting, and in home care. [AR 760.]

On September 3, 2010, Judge Farris issued an adverse opinion as to Lucero's disability claim.  The ALJ carefully considered all of the evidence and concluded Lucero was not under a disability from December 31, 2000 through the date of this opinion. [AR 22-33.]

On September 24, 2010, Lucero appears not to have heard about the ALJ's decision according to this therapy note. [AR 759.] On November 30, 2010, the therapist wrote that Lucero was depressed but happy she moved.  She was taking anti-depressants.  The note indicates she was going to call Attorney Martone, who became her second attorney.

On December 2, 2010, Lucero provided a statement to the Social Security Administration. [AR 18.] She stated she had called her earlier attorney's office in September and was told they had not received an ALJ decision then and would not hear until October.  On November 22, 2010, her prior attorney called to tell her about the ALJ's unfavorable decision.  Lucero asked what to do next, and Attorney Cohen suggested Lucero not appeal and that she could reapply.  According to Lucero, she did not receive any advice about her appeal rights until she contacted Attorney Martone on

37

November 3, 2010.  She still had not received a copy of the ALJ's decision.  Lucero wondered if a name mix-up on the decision contributed to the problem. [AR 18.]

On December 6, 2010, Attorney Martone filed a request for review. [AR 16.] On December 8, 2010, Martone argued that good cause existed to extend Lucero's time to request review. [AR 14.]

On December 14, 2010, a therapy note indicates Lucero had blood in her urine according to a CT scan.  The note seems to suggest that Lucero try volunteering at a hospital, nursing home, or with Hospice. [AR 756.]

### *2011 Medical, Therapy and Disability Records*

A therapy note, dated January 18, 2011, stated that "Annette" had told Lucero or the therapist that "as long as no money, that shouldn't be a problem." [AR 755.] It appears that the reference indicates Lucero was told that working without pay would not impact her disability appeal. [AR 755.]

On April 18, 2011, Hollister wrote a letter to Attorney Martone.  She was sending him the Mental RFC Assessment as requested.  She stated that there were 85 pages of records to summarize so she appreciated being allowed to summarize them.  Hollister noted that Lucero had symptoms of depression for 2 or more years, but that on May 12, 2009, Hollister adjusted the diagnoses as Lucero's outlook and mood were improved.  She described Lucero as a very motivated client, who demonstrated discipline in changing her lifestyle and medications.  There were ongoing family stressors but Lucero was doing well.  Lucero was hesitant to take a job without the prospect of insurance should she require it.  Hollister stated it was difficult to overestimate Lucero's frustration in not having a way to contribute to society.  Lucero found it challenging to be dependent on her son and wanted to "pull her own weight."  Should Lucero get disability, Hollister opined that Lucero

would enroll in training immediately.[23]  She had worked as a cashier at Walmart for 8 years and part-time at Family Dollar.[24]  After clearing a job through Martone's office, Lucero decided to seek part-time work at a local hospital as a receptionist.  Hollister described Lucero as intelligent and caring.  She wanted to help transition Lucero into the work world "once her disability claim has been awarded." [AR 750-51.]

On April 18, 2011, Hollister filled out a Mental RFC Assessment, noting no impairments or limitations with respect to Lucero's ability to understand, concentrate, or persist.  There were no limitations in social interaction or adaptation.  The only restriction, according to the therapist, was physical due to pain in one of the knees.  It would be inappropriate for Lucero to take a job that required her to be on her feet or do heavy lifting.  The therapist stated she assumed that Lucero had a history of successfully working with others in the past.  The Court notes, however, that the earnings records do not clearly demonstrate that Lucero ever worked steadily or for long periods of

---

[23]Based on many of Lucero's counseling records, it is clear that she was motivated and wanted to work.  She had plans to work, she looked for job ads, she applied for positions, she contacted employers, she felt pleased when she submitted an application for a job, she was disappointed when she did not get a particular position, she wanted to volunteer, she did not want to be a drain on her children, she wanted to contribute to society, and she had free time she did not know how to fill.  She was discouraged from pursuing work opportunities due to concerns that working would adversely impact her disability claim.  While it is understandable that many individuals are hesitant to work for fear of jeopardizing their disability benefits or application, it is unfortunate that Lucero was discouraged from following through in obtaining work when the therapy records indicate she could work, wanted to be employed, and that working made her feel good and productive.

[24]The earnings records are unclear or may not be quite complete in confirming where Lucero worked each year when she had earnings.  But, for example, it is clear she worked at Walmart in 1992, 1993, and 1994, when her annual earnings ranged from $1222 to $9350.  She may have had some earnings from Walmart in 1998.  She worked at Family Dollar in 1997 and 1998, with annual earnings of $2800 and $4100.  There are earnings from 1988 to 1991, ranging from $1700 to $7911, but it is not certain where she was employed then.  Thus, it is not true that Lucero worked full-time at Walmart for 8 years.

time. [AR 85.]  The therapist opined that Lucero, with the help of therapy, had become better at making plans independently of others. [AR 752-74.]

On November 23, 2011, Lucero had a CT of her cervical spine for radiating neck pain. There was degenerative disc and joint disease at C5-6 but nothing severe.  There was mild to moderate canal stenosis.  She had osteoarthritis at uncovertebral joints bilaterally, with moderate to severe right foraminal and moderate left foraminal narrowing. [AR 822.]

### *2012 Disability Records*

On July 9, 2012, Attorney Martone wrote a letter to the Appeals Council arguing that Lucero's prior counsel should have accepted Judge Reyes's June 24, 2008 decision and then have filed new concurrent applications with an onset date of June 25, 2008.  According to Martone, it was clear that prior counsel's request for review allowed the Appeals Council to review the whole case which put the favorable portion of Judge Reyes's decision at risk. [AR 747-48.]

On August 15, 2012, the Appeals Council denied the request for review but discussed the case to some extent.  It noted that Lucero's request was late, but that there was good reason for the delay.  It found no reason to review the ALJ's decision.  However, it considered Attorney Martone's letter, therapy records from 2009-2011, and the x-ray report, dated November 21, 2011. [AR 3.] The Appeals Council considered Attorney Martone's request to withdraw the prior request for review and reinstate the ALJ's June 24, 2008 partially favorable decision.  However, the Council stated it already acted on that request for review and no reason existed to grant the request to withdraw the prior request for review. [AR 3-8.]

## VIII.   DISCUSSION OF ALLEGED STEP TWO ERRORS

At step two, the ALJ determined prior to the date Lucero was last insured, *i.e.,* December 31, 2001, that she had three severe impairments.  Those severe impairments, however, did not

40

include obesity and urinary incontinence.  [AR 24.] In contrast, after the date of last insured, the ALJ concluded that Lucero had multiple severe impairments, *including* obesity and urinary incontinence. [AR 24.] Lucero argues that the ALJ should have found obesity and urinary incontinence were severe impairments before December 31, 2001, as well as after that date, and that the ALJ's inconsistency in that regard evinces error.  In other words, counsel argues that the ALJ should have found Lucero's obesity and urinary incontinence to be severe impairments from December 31, 2000 to December 31, 2001.

In support of her argument, Lucero notes records indicating that she was 5'3" tall and weighed between 208 and 219 pounds.  With a BMI of at least 36.8, Lucero claims this is "level II obesity" [Doc. 20, at 13] (*citing* SSR 02-1p), although the Court finds no medical records discussing or diagnosing "level II obesity."  Medical records confirm complaints of urinary incontinence with coughing and sneezing.

The Commissioner argues that it is Lucero's burden to show obesity and urinary incontinence were severe impairments prior to the date she was last insured.  Defendant further observes that the ALJ noted that evidence in the record did not show Lucero's obesity made her unable to ambulate effectively. [AR 26.] Moreover, Lucero testified at the hearing before Judge Farris that her biggest medical problem was her legs, not obesity and not urinary incontinence. [AR 829.] Even after the date Lucero was last insured, the treating physicians did not note any limitations based on Lucero's obesity or urinary incontinence.  While there are no limitations of record with respect to these conditions, Lucero had a procedure for urinary incontinence and was attempting to exercise and diet in relation to obesity.

The ALJ stated she had reviewed the entire record in reaching her findings, including her RFC finding.  Indeed, the ALJ specifically discussed many of the 2000-2001 records. [AR 27-28.]

41

The 2000 records provided by Lucero are few in number and emphasize knee problems, depression, GERD.  They do not reflect complaints of obesity or urinary incontinence.  There does appear to be one record from 2000 that states Lucero had lower abdominal pain but no complaints of urinary symptoms. [AR 261.]

With respect to 2001 medical records, there is at least one mention that Lucero had incontinence problems if she coughed or sneezed. [AR 224.] The remaining records in that year indicate hypothyroidism, urinary tract infections, hematuria, and vaginitis. [*See* AR 28.]  She was diagnosed with ovarian cysts.  She was described as "moderately obese." [AR 240.] She was given dieting guidelines. [AR 229.] On August 30, 2001, Dr. Smaltz, a urologist, stated that an urologic review of Lucero's symptoms was "completely unremarkable."[25] [AR 240.]

The Court cannot re-weigh the evidence in deciding whether the ALJ erred at step two by not finding obesity and urinary incontinence were severe impairments.  Certainly, based on the record reviewed by the ALJ, during those two years, not many records mention these issues other than to record Lucero's weight.  However, the Court concludes that the ALJ's determination that Lucero had severe impairments of ovarian cysts, hypothyroidism, and bilateral knee pain, prior to the date last insured, was supported by substantial evidence.

The Court acknowledges that a determination that an impairment is "severe" at step two requires only a de minimus showing.  Grogan v. Barnhart, 399 F.3d 1257, 1263 (10th Cir. 2005). However, the evidence in the record relating to obesity and urinary incontinence prior to Lucero's date of last insured are virtually non-existent.

---

[25]The ALJ did not explicitly reference Dr. Smaltz's letter in her decision [AR 28]; however, she clearly reviewed the 2001 records and is under no obligation to discuss each and every record.

Even if an error could be found in the ALJ's step two determination for that time frame, it is harmless. Once the ALJ finds that the claimant has any severe impairment, she satisfied the analysis for purposes of step two. Her failure to find that additional alleged impairments are also severe is not in itself cause for reversal. *See* Oldham v. Astrue, 509 F.3d 1254, 1256–57 (10th Cir. 2007); Maziarz v. Sec'y of Health & Human Servs., 837 F.2d 240, 244 (6th Cir. 1987).

Still, in determining the claimant's RFC, the ALJ must consider the effect of all of the claimant's medically determinable impairments, both those deemed "severe" and those that were "not severe." *See* S.S.R. 96–8p, 1996 WL 374184, at *5. Here, the ALJ noted SSR 02-1p in her decision, stating she considered Lucero's obesity by itself and in combination with other impairments. [AR 26.] The ALJ also addressed Lucero's complaints of urinary incontinence, the related surgery she had later, and the fact that Lucero continued, at times, to complain of urinary incontinence. [AR 27.] The ALJ found that after careful consideration of all of the evidence, including obesity and urinary incontinence, Lucero's medically determinable impairments could be expected to cause the alleged symptoms, but that her statements regarding the intensity and limiting effects of those symptoms were not credible to the extent they were inconsistent with the RFC.

The Court finds no error by the ALJ at steps two through five of the sequential evaluation.

## IX.  CONCLUSION

The Court concludes that there is no legal basis for withdrawal of the earlier 2008 ALJ opinion. Additionally, the Court concludes that substantial evidence supports the ALJ's 2010 decision and denial of benefits, and that the ALJ committed no error.

IT IS THEREFORE ORDERED that Lucero's motion to reverse and remand [Doc. 20] is
DENIED.


_Lorenzo L. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge